May it please the Court, Scott Christensen for Boy Scouts of America and San Diego Imperial Council, Boy Scouts of America. For many years, the City of San Diego has provided substantially identical leases of dedicated parkland in Balboa Park to all three national camping organizations, Campfire, Girl Scouts, and Boy Scouts. Each runs a campground that's open to the public in San Diego. In 2001, the City renewed virtually identical leases with Girl Scouts and Boy Scouts using exclusive negotiations. The only difference is that a Boy Scout promises to do his duty to God, whereas the Girl Scout promise God is optional. On these facts alone, there is no basis to conclude that leasing to Boy Scouts on the same terms as Girl Scouts has the primary effect of advancing religion, and as a result, there is no violation of the Federal Establishment Clause. And that's not really the only difference. I mean, unless you're using it symbolically for the fact that there is a religious component to the Boy Scouts and not to the Girl Scouts, but there's more in the record, much more in terms of the religious nature of the Boy Scouts. What I'm saying, Your Honor, is that the – if you have virtually identical leases between Boy Scouts and Girl Scouts – Correct, Your Honor. I'm contrasting the – giving an identical lease to what's been branded a religious organization versus one in which God is optional on identical terms. We can't say on that fact alone that the lease to Boy Scouts has the primary effect of advancing religion. The City has numbers of other leases. Were there – were any number of those also the result of exclusive negotiations? Yes, Your Honor. The – we put in the record the lease to Girl Scouts, Next Door, Camp Fire, as we understand it. The City was authorized to negotiate exclusively with Hillel, with Hebrew Day School, and a number of other organizations. And I guess the record – I think your opponents make the point that they were authorized, but I guess we don't know for sure if those negotiations followed. But it should be the authorization itself that is relevant. Well, that's a – I understand you. Are these leases that are exclusive negotiations to organizations that have been there before and have improvements on the land and have figured out how to use it? We don't know for all of them. Certainly for Girl Scouts, that's the case. The question about whether exclusive negotiations made a difference didn't come up until the district court's ruling. So the record is – What I was trying – what I was trying to find out was when they're doing something new and nobody has leased it, do they open it up to everybody? And then when somebody is renewing, after having approved it there, do they negotiate exclusively? Kind of the way a landlord would in commercial space. My recollection, Your Honor, is that it's mixed. But there's – the record shows that the city's application, the city's decision to negotiate exclusively with some lessees is based on neutral principles and the city's discretion. Well, what's hard here is that the two things you just said are kind of opposite to each other, but that's kind of what the record shows. There aren't any principles. It's the city's discretion. Yes. And there is no evidence that the city's discretion is levied in any way that advances religion. But it would be helpful to me if you'd concentrate on the California no-aid provision because that seems to me to be one of the pieces, moving pieces here, as to which this question of whether you're looking at this broadly or narrowly either might matter, but at least we need to understand whether it matters. Because there – I mean, I gather you're not contending that there isn't aid going on here. We have argued that there is not aid going on, that aid can't mean a mere benefit. We don't use the term aid to describe the benefit that every lessee and every city agrees. But this isn't every lessee. It's a lessee who's getting a very valuable lease for zero rent. It begs the question, Your Honor, whether it's a very valuable lease and it's in exchange for $1.7 million worth of improvements over the first seven years of the lease. That's a pretty hefty sum for a charitable organization. But the Boy Scouts would have to go and pay a whole lot more money if they leased parallel land anywhere else and make the $1.7 million. Yes, but if the Boy Scouts were to go out and lease other property at some sort of market rate for something other than dedicated parkland, it wouldn't be paying – it wouldn't be required to be putting in $1.7 million of improvement for that property unless it was in exchange for rent. In moving from the Federal Establishment Clause to the No Aid Clause, Your Honor, it's important to note, as this Court has recognized, that any attempt to achieve a greater separation of church and state than under the Federal Establishment Clause is limited by the Federal First Amendment, in particular the Free Exercise Clause and the Free Speech Clause. What case is that? That's Chrysler. Chrysler v. City of San Diego, 1F3rd at 778-02. As I've explained, there is no aid provided simply because Boy Scouts are receiving a benefit. In every transaction, we don't consider the party – the benefits from the transaction, which both sides do, to be considered aid. With respect to the No Aid Clause, there is no appropriation here from the city, there is no payment from any public fund, and there is no grant of any aid to any religious sect, church, creed, or sectarian purpose. The key question is this piece of land. Do we? Just a huge piece of land. Right. For $1.7 million for the first 7 years. Do we? The record evidence shows. But they're not paying $1.7 million to the city. They're building something for their own use. Not for their own use alone, but for the use by the general public as well. This property remains owned by the City of San Diego. It's used extensively by the general public. The city gets back all the improvements at the end of the lease. Could you describe the improvements? Yes, Your Honor. Before the $1.7 million, everything that exists on the property was built by Boy Scouts. The meeting rooms that are used by members of the community, all of the campgrounds, the swimming pool that's used extensively by community groups, and the $1.7 million worth of improvements are to be worked out with the city. It includes resurfacing the parking lot, providing a gate at the front to increase the safety for youths who camp in the campground. I didn't understand. Were the meeting rooms and pool built by the Boy Scouts, or were they there? Everything on Camp Balboa was built by the Boy Scouts. It was undeveloped property beforehand. But before the current. So it was bare land. The Boy Scouts built the pool. The Boy Scouts built the meeting room and so forth? Yes, Your Honor. I get it. Thanks. If the case turned on this question of whether there really is aid under the financial arrangements, do we have enough record on this to decide at this level, or would we have to have the lower court figure that out? You have a summary judgment record, Your Honor, that shows that Boy Scouts put more into the property than it would cost to buy outright for the same use. Plaintiff's experts who valued the property for use as a youth campground said that it would cost less for the Boy Scouts to buy it for their exclusive use than if you add up all the money that the Boy Scouts have invested in the property and must invest in the property under the terms of the new lease. And that was not controverted? That's the summary judgment record, Your Honor. That was based on plaintiff's experts. That's not my recollection. I thought it was much more than that in terms of the $1.7 million. No. If you assume it's much more than that, if you assume that you can pave paradise and put up a parking lot and hotels and resorts, this property is dedicated parkland in both Balboa Park and Mission Bay Park. It can only be used for parkland, for cemeteries and for recreation. There is no market for this kind of parkland. That's not the question, as I understand it. The question is, what would the Boy Scouts have had to pay for a similar piece of land somewhere else? That's their benefit. Boy Scouts wouldn't go out and pay $1.7 million to buy or lease a campground. Boy Scouts is a repositioning. I have no idea what they would do. But the question is, could they go and get 18 acres of what I gather is lovely land, let's leave the park, the fact that it's in the middle of a park, out of it, with all these improvements on it, let's assume, for $1.7 million? Is there anything in the record to suggest they could? Your Honor, the record shows that property with such restrictive uses could be used for recreation, for parkland or for cemeteries, unless two-thirds of the electorate decides that it should be put to cemeteries. No, that's not the question I asked you. I said, let's forget that it's parkland. All right? If they just want a place to have a camp, is there anything in the record that suggests that they could get a piece of property this size in San Diego with these improvements on it for $1.7 million? The only examples are these kinds of properties, Your Honor, because there aren't other kinds of properties with these kinds of restrictions on how they could be used. I'm quite confused, but okay. If we assume the question of aid, if in light of our time, I wonder if there were some element of aid to the Boy Scouts, would that be incidental? Within the view of the California courts? Yes, Your Honor, and that's the key question, is that whether the city's leases – the key question is really whether the city's leases provide a public benefit, which they do, and no more than an incidental benefit to a religious sect, church, creed or sectarian purpose. The Court doesn't even need to reach the question of the incidental benefit, however, because Boy Scouts is not a religious sect. It is not a church. It is not a creed. It is not a sectarian purpose. The prohibition on aid to sectarian purpose in California's version of the Blaine Amendment shares what a plurality of the U.S. Supreme Court has called a shameful pedigree, because sectarian was open – it was an open secret that sectarian was code for Catholics and that the no-aid clause, like other Blaine Amendments in other states, was born from anti-Catholic sentiment in the late 1800s. At the very minimum, sectarian means sectarian when it comes to the term sectarian purpose. It is relating to a particular sect and not religion in general. If you look in the years after the no-aid clause was adopted – Don't the California cases, though, use it to mean religious? No, Your Honor. If you look at how the California Supreme Court applied it in the years after it was adopted – I'm talking about recently. Recent cases, some do, but the cases involve sectarian institutions, such as California statewide, which was where the institutions were presumed to be pervasively sectarian institutions. Counsel, I understood sectarian to mean a sect like the Methodists, the Episcopalians, the Catholics, as opposed to religion in general. And I have the – I guess it's the same question. Has the California Supreme Court or have the California appellate courts said whether it means that, whether it means a sect in the dictionary sense, or whether it means religion in general? Your Honor, the California Supreme Court has addressed it in the years after the no-aid clause was adopted. In 1924, the California Supreme Court held that the King James version of the Bible  I have a rare fact about what the California Supreme Court has done recently, so it isn't very helpful to know what they did in 1924. So what have they done recently? But in Paulson, Your Honor, this Court decided en banc that you have to look at the way that the terms are used in the ordinary sense and look to the way the terms are used at the time that it was drafted. I'm trying to provide – Wait a minute. You started to describe a Supreme Court case, and I gather from what led to your citing it that it said sectarian means a sect, not religion in general. And, of course, if that's been overruled by subsequent authority, that matters. Has it been? It has not been overruled, Your Honor. The California Supreme Court decided that the King James version of the Bible, which is used by Protestant Christians, was non-sectarian because it was used by multiple sects. The Court said, Defined sect and sectarian as a body of persons distinguished by peculiarities of faith and practiced from other bodies adhering to the same general system. This is Evans v. Selma Union High School, 193 Cal 54, 1924. The King James version of the Bible was used by multiple sects, and it was, like the Talmud, like the Koran, like the teachings of Confucius. In contrast, the California Court of Appeal prohibited the use of public funds in restoring historic missions because the Roman Catholic Church is a sectarian institution. All this history is laid out in the amicus brief filed by the Beckett Fund for Religious Liberties. The upshot was that the state could support Christianity in general but not particular sects, especially Catholics. If you look at even contemporary California practice, the the the So you read these cases as saying that you could you could support Christianity in general to the exclusion of other religions? Certainly at the time of these cases, yes, Your Honor. Do you think that the California Supreme Court still thinks that? I don't know whether the California Supreme Court still thinks that. I know that the California legislature still thinks it's appropriate to begin every session with a prayer. I know that the California Senate thinks that it's still permissible to hire a full-time chaplain and has since 1897. I know that the California the preamble to the California Constitution begins by thanking Almighty God for the freedoms that he's provided the citizenry in California. And none of this, I would think, would be considered unconstitutional. Certainly the Constitution shouldn't be considered unconstitutional. Counsel, I was trying to determine whether there was more than an incidental benefit to religion, assuming for purposes of my question that religion in general counts as sectarian as opposed to a particular sect. Just assume the contrary of what you've been arguing. Even if you assume that. Partly I know about Boy Scouts from the record and partly from experience. And it used to be in the 50s all boys would join Boy Scouts pretty much and it was mostly knot tying and camping and that sort of thing. Does the record establish that it's more heavily religious now? No, Your Honor. Boy Scouts, it's hardly possible to support religion and be more nonsectarian than Boy Scouts. Boy Scouts are absolutely nonsectarian, as mentioned in this Corton decision. There's no contrary evidence to that. This Court noted that Boy Scouts don't require Scouts to affiliate with any religious organization. And so you're going back to the notion that sectarian in this context totally means Christian sex and as long as they're not based on Christian sex, that's all that matters. Even if you read, even if you don't read it as limited to Christianity, Your Honor, the no-aid clause does not prohibit aid to religion in general. It prohibits aid to religious sects, churches, creeds, or sectarian purposes. I understood, Judge Kleinfeld, to ask you to let go of that for now and assuming that it means religious versus nonreligious, is there incidental benefit? That seems to be the key issue in the case to some of us. So why don't we talk about it? If you look at the religious acts that occur on the least properties, which consist of saying grace at meals or promising to do one's duty to God or to be reverent, those are entirely lacking in costs to anyone and are not supported by the leases. These are the same activities that would be going on on this property if there were another lessee. It's the same activity that would be going on on this property every time Boy Scouts camp in a state or federal park. Any benefit to this religious aspect of Boy Scouts is purely incidental, remote, or indirect. This is for counsel. Counsel, before we lose you, I'd better come back to an issue that Judge Berzon raised with you, and I want to find out about the record. Let's assume, for purposes of my question, that this is not city land dedicated to park use. Suppose it's just open land unzoned. I don't know if you have unzoned land in California. We have lots of it in Alaska. People can do anything there, and there's a comparable lake or whatever is nice about this land. Does the record establish what the acreage involved would lease for, whether it would lease for more or less than the 1.7 million in improvements? There are no comparable leases in the record. The comparables that the plaintiffs tried to put in the record include gas stations, hospitals, and hotels that are not comparable to the highly restricted use on this particular undeveloped acreage. I don't really understand. I guess I'm having trouble with this answer because it seems like it's a fairly straightforward question. These people, the Boy Scouts, want to use it for recreation. So the limitation to recreation is not a limitation they care about. They want to go out. So if they wanted to go outside public parks and rent a piece of property that could be used for their recreation because that's what they want to do, I thought there was material in the record presented by the plaintiff's real estate expert that suggests that they would have to pay much more money. Is that not true? But what I'm saying, Your Honor, is that those aren't comparable. But you're saying they're not comparable because they don't have the restrictions to recreation, but they don't care about a restriction to recreation because they want to do recreation. So why else isn't it comparable? Well, I think the record shows that the Boy Scouts wouldn't be going out and paying out of their pockets for this kind of property. Well, that's exactly the point. That's why they're getting aid, because they're getting something they couldn't pay for themselves. Right. But even, as I mentioned earlier, Your Honor, even if you assume that it's aid, it has to be aid. Well, that's fine. But we're trying to settle that one question. And you began with it. And you said that it wasn't aid. And we're trying to get to the bottom of why you're saying that. So are you now saying it is aid? I can't say that it's aid, Your Honor, simply because the Boy Scouts are benefiting from this lease, from this transaction, unless we say that the Girl Scouts are getting aid and Camp Fire is getting aid. Oh, they probably are. Well, excuse me. And every nonprofit, let's say, in the city is getting aid. Sure they are. Sure they're getting aid. But the point is that they don't have a religion problem, but they're getting aid. Right. And to treat them differently because of the so-called religion. Why wouldn't they have a council? Is there a distinction? Suppose those little girls say grace before they eat lunch. Does that make it any different from the Boy Scouts? Except that. Why isn't that? Go ahead. In order to join Boy Scouts, a boy has to promise to do his duty to God. In Girl Scouts, they've made God optional. So that doesn't mean. So the difference is the oath and the Boy Scout law, and that's it. Yes, Your Honor. Well, wait a minute. You agreed at the beginning. Grave, clean, and reverent, and do my duty to God and my country. And that's the only difference? That's the only difference between the two organizations. And there's a whole program that goes along with that with regard to getting emblems and having chaplains and having religious requirements for the leaders of the Boy Scouts. The record shows, Your Honor, that that same religious emblems program is the same program that Girl Scouts runs. Well, so maybe the Girl Scouts have a problem, too. How does that help here? It doesn't help. More importantly, it's neither the Girl Scouts program nor Boy Scouts program. It is a program that is run by the religions themselves. It is not a Boy Scouts program. The Catholic Church is the one that prepares the material and decides whether a boy earns the religious emblem for the Catholic Church. The only involvement Boy Scouts has is that the Boy Scout is permitted to wear a knot on his uniform and on certain occasions wear the emblem of his particular faith. But the same materials on religious emblems are sold in Girl Scouts shop and provided to Girl Scouts because it's not a Girl Scouts program or a Boy Scouts program. Are you talking about merit badges? These are not merit badges, Your Honor. This was a question that also came up in the last oral argument. These are not merit badges. They are not Boy Scout programs. They are programs that are run by religious faiths that Boy Scouts permits youth to wear on their uniforms, but the programs are entirely the programs of the religions. And is that some requirement to the boy participate in one of these? No. There's absolutely no requirement for boys to participate in one of these. I thought it was on the record that there was. The only requirement. In any event, it's not just the oath. There are other things that are done. You can bicker about the details of them, but there are other things. There are chaplains in some of these organizations. There was a chapel at the Camp Palboa. There are religious services at Camp Palboa, as I understand it. Is that not true? The only religious services are ones that would take place in any campground in the State of California. When boys are camping over the weekend and have religious obligations of their particular faith, such as, say, math or observing the Sabbath. I guess one question we might be getting at is whether the religious exercise is attributable to the lessee. And I would think that when the Girl Scouts, with no requirements in their oath or program or whatever, get together and say grace or something like that, they're acting as individuals. And it might be different if the lessee has programs that either encourage or enforce religious exercises. The only program, Your Honor, is that Boy Scouts are required to promise to do their duty to God. But Boy Scouts does not provide any content to that duty. In the same way that the Boy Scouts provides content to the other duties in the Scout oath, Boy Scouts leaves duty to God, the content of duty to God, to the boys' parents and religious leaders. Does any of this argument affect the different conclusion of whether any aid would be incidental? Could you repeat the question? Well, I'm trying to get at whether the argument you've just been making also affects another question in the case in that is if we concluded there was some aid, was the aid simply incidental to religion and not? Unquestionably, because there is nothing about the leases that promotes the religious aspects of Boy Scouts. The Boy Scouts would be saying their duty to God anywhere else. They would be saying grace at meals or conducting religious services while they're camping over the weekend in order to abide by their individual religious obligations. There's nothing about the lease that allows them to fulfill their individual religious obligations or Boy Scouts' religious obligations. So is your best analogy to the most recent bond case in the California Supreme Court? Is that the one whose name I'm now forgetting? The California statewide authorities. Yeah, right. Is that what you're essentially saying, that there may be, although you were arguing about whether there was aid, that it was not to any, it was to a secular program? Is that your best argument? Absolutely. Yes, Your Honor, because California statewide, the California Supreme Court said you don't look to the religious character of the schools. You look to the nature of the benefit being provided. And if it is a benefit that is primarily secular, then it passes muster under the No Aid Clause. We are way over time. My time has run. And we will give you, say, three minutes, Your Honor. Okay. Thank you, Your Honor. May it please the Court. Drew Woodmansey on behalf of the Breens and the Barnes-Wallaces. Thank you, Your Honor. In approving the two disputed leases to the Boy Scouts of America, the City of San Diego demonstrated a preference for religion over non-religion in violation of Article I, Section 4 of the California Constitution, also known as the No Preference Clause. The City violated Article I, Section 4 by making a benefit. Excuse me, Counsel? Yes, Your Honor. Counsel, before we get to the merits, I have a jurisdictional question I need your help with. We once made a terrible mistake that the Supreme Court taught us a lesson on in a case called the Niguez, the Arizonans for official English case, because by the time it was adjudicated, the woman was no longer working for the State of Arizona, and we overlooked mootness. We sort of avoided mootness in a way that the Supreme Court disapproved of. Now, I looked at the complaint here, and the original complaint says that the boys were six and seven, respectively. The amended complaint filed two years later says they were still six and seven, respectively. Now, it's implausible that they didn't get older in the two years, so I'm assuming that that was just a Scrivener's error. That means that the boys are now almost 18 and over 18 and no longer qualified in one case and won't be qualified by the time of mandate issues in the other case to be in Boy Scouts. So why isn't it moot? Your Honor, first you are correct in your assumption. My understanding is that one of the two boys at least is under the age of 18 still. Moreover, the injury here that was the basis for the court's standing order is based on the avoidance of the property by the individuals, especially the individuals who are agnostics or atheists, and the same injury is also present here for not only the boys but the parents as well. The parents are also unable to join scouting as adult volunteers and leaders. They are agnostics and atheists. The parents, I don't think the complaint was about them being, them volunteering. Maybe you could refer me to the paragraph if I don't remember it. I thought it was about their boys being in Boy Scouts, not about the parents being volunteers. Your Honor, and also in the case of the agnostic child, the child is the boy from the Green family. He is still under the age of 18 as well. My understanding is he is 17 at this point, maybe 16. In fact, the plaintiffs were the parents and the children or just the parents? My recollection, Your Honor, is that the plaintiffs were also the parents. They also, the parents. The parents were plaintiffs. Were the children the plaintiffs? On behalf of the children as well. Okay. Also on their own behalf. So the parents can't be plaintiffs on behalf of their children once the children are adults, and that's 18 in California, isn't it? I believe so, Your Honor. Yes. But there were also plaintiffs on their own behalf or there were not? Your Honor, I would have to double-check the language of the complaint. I actually have. Moreover. And I thought they did talk about that. Moreover, yes, that was the basis for the Court's standing as well as the family's avoidance of the property, not just the children but also the parents, the agnostic atheist parents. Let me say that. Yes, Your Honor. Oh, I thought the only issue was the children. So maybe just point me to the language you're talking about. Well, Your Honor. I've got it right here. Just on the face of the complaint, they are named as plaintiffs not on behalf of their children. That is ER 587 is the face of the First Amendment. Yep, I got that. So that would be even to believe that the plea was in fact. They have to have a claim that's not moved. That's the thing. Correct, Your Honor. If you also look at the allegations on behalf of the Breen family beginning at ER 590, it says that they are precluded from being volunteer members and volunteer adult leaders as well. That action is alleged for the Orange-Wallaces at page 589, ER 589. But does it say that the ‑‑ does it say they want to be leaders or volunteers? I mean, I'm precluded from being a volunteer in, I suppose, the lady's auxiliary, but I don't want to be. It never would occur to me to be. The fact of the matter is, Your Honor, because of the exclusion of non‑believers by the Boy Scouts, the Breen family certainly does not want to join the Boy Scouts. Well, not that they don't want to. They could not join the Boy Scouts, so it would be a futile gesture at this point. The Boy Scouts have fought all the way up to ‑‑ Well, it's got to be ‑‑ you need a concrete injury to them in order to satisfy Lujan and that whole line of standing cases. So I want to know what it is. Your Honor, again, as found by this court as well, their avoidance of the particular properties is also the basis for standing. They are aware of the Boy Scouts' exclusion of non‑believers. They certainly are non‑believers. Their avoidance of the property where these two leaseholds are constitutes standing for the purposes of this Court's analysis in the 2008 order. In other words ‑‑ Why would that ‑‑ why ‑‑ I'm sure you read my dissent the last time, and I need your answer to it. Why is their avoidance any different from, say, oh, a Baptist who has something against Catholics avoiding a hotel that hosted a Catholic convention? Well, Your Honor, again, this is a far different exercise. This is a parcel of city land, dedicated public park land, that's been given to the Boy Scouts for a 40‑year period. This is not ‑‑ If they're going to use it, they need to deal directly with the Boy Scouts. They need to pay money to the Boy Scouts. Correct. And the Boy Scouts, Your Honor, the important thing there, too, is the Boy Scouts do not have to use the money for the property's upkeep. It goes into the general fund of the Boy Scouts, which could theoretically be used to process an application excluding someone on the basis of religious non‑belief. So they're not just standing around saying we object in some abstract way. They're saying if we would like to use this property, but if we did use it, we would have to affirmatively deal with and support an organization that doesn't want us. Correct. Mr. and Mrs. Green would be forced, if they wanted to use the property, to pay a fee I believe of $25 or more to camp, to the Boy Scouts, an organization that would then use it for its general fund, not to rake leaves at the property, but going to their general fund, which could be used for any purpose. And that is the objection that Your Honor ‑‑ Do they ever plead that they're campers? Do they ever plead that they're campers? I mean, some people like to camp and most don't. Yes, Your Honor. They actually did, I believe, in their declarations in support of the motions on standing, they did plead that they are frequent users of other portions of the parkland, including Mission Bay Park as well as Balboa Park. Whether or not they talked specifically about camping, I don't recall, but they certainly talked about their desire to ‑‑ That's what I asked you. Excuse me? That's what I asked you, camping. I don't recall. A lot of people camp and most people don't. But this camp is just about camping, right? So the fact that they've returned from camping. Correct. It's more than camping. It is also a swimming pool. There's an amphitheater. My understanding is there are archery, that sort of thing as well. So there are day uses permitted as well. It is more than just camping, correct? You don't need to go overnight. You could use it for the day. Could you answer some of the questions that came up in your opponent's argument? First of all, with regard to the record dealing with the aid question. Yes, Your Honor. What does the record show, if anything? Your Honor ‑‑ Go ahead. With respect to the issue of whether or not the land could be valued, there was testimony from the city's real estate assets director that value is difficult but not impossible because of the parkland restrictions. But Your Honor's question indeed illustrates the point. Whether or not there's a savings to the Boy Scouts in terms of what they would pay otherwise were they to go seek a 15.6 acre leasehold elsewhere in San Diego. And the evidence in the record, and I don't have the specific site except for the summary of the material facts in dispute or not, ER 1974 at paragraph 39, the evidence from plaintiff's expert, Mr. Doray, who is an independent real estate appraiser, was that they would spend approximately $10 million to secure a substitute leasehold over the term of the lease. That was Mr. Doray's testimony. The Boy Scouts disputed it, but I would note that they did not have, my recollection is, an independent real estate appraiser to combat that with specific opinions as to what the leasehold would be worth if the Boy Scouts were to go elsewhere. Moreover, the city's real estate assets director said that they did make an effort at times internally within his office to value the parkland even with its restrictions. And at ER 2725, paragraphs 9 through 10, he said that he believed, though difficult, the land could be developed for commercial purposes consistent with the parkland designation. So on both sides there is aid. First of all, there is aid in the sense the Boy Scouts saved money from what they would have to pay to secure a couple of years. Kagan. Which is the right perspective, what it costs the city or what it's worth to the recipient? I believe the correct inquiry from the case law is the benefit being conferred on the recipient. Moreover, the jurisprudence from the California Supreme Court and from the Ninth Circuit dictates that aid can be more than financial. There need not be financial aid. There can be the prestige and the power of the city lent to an organization or lent to religion that would offend the no-aid provisions of the California Constitution. I have a little trouble understanding a couple of aspects of aid. One is what the aid clause prohibits is aid to religion, not aid to, oh, for example, someone or some firm that's entirely secular and the firm does something that incidentally benefits religion. The second problem I have is what is aid? Saturday at the grocery I bought a bag of coffee for $16. It was an aid to me because the caffeine makes me lively and awake and alert for this argument. It was an aid to the grocery store because they got $16 that they wanted more than a bag of coffee. I don't understand why this isn't the same thing. Your Honor, first, aid can be non-financial under the case law. Aid need not be limited to just a payment of dollars from one organization to the other. Lending the power in the procedure. I think you missed the question. In a bilateral voluntary exchange, ordinarily both sides of the exchange are benefited, and each side is benefited more than the cost from the point of view of that side. Otherwise, there would be no voluntary transaction. Your Honor, here again, the benefit the Boy Scouts receive is that they don't have to secure a leasehold interest for approximately $10 million if it were not given to them by the city for free. They would have to go out and spend money, $10 million. Moreover, the aid, Your Honor, was used here by the Boy Scouts to secure a capital contribution from its investors or from its donors. The Boy Scouts went to the city eight years before the lease expired in order to seek the ability to go and offer that longer-term lease as evidence to get more money from its donors. So they did use it for a tangible benefit beyond just the aid that they're getting from saving money from securing an alternative lease in the city of San Diego. So the aid can be more than just the financial dollar, the dollar amount that's being funneled to the Boy Scouts. There is more aid here than that. There is aid from a non-financial standpoint. Sure, Pat. If I rent somebody some land that I own in exchange for which he builds a cabin but doesn't pay me any money, I aid him by giving him a place to build his cabin, and he aids me by building a cabin there. I still don't understand, if any voluntary exchange that benefits religion violates the aid and benefit clause, then I suppose that Sam's and Walmart have to prohibit churches and church-affiliated institutions from buying groceries there. Your Honor, in the hypothetical of your cabin, whether or not you derive a benefit is not relevant to whether or not the Boy Scouts or the person that builds the cabin on free land gets a benefit as well. We both get benefits. And that is a relatively clear position. Well, what Judge Klontz is saying is there has to be a limiting factor here where a market rate exchange washes and nobody is getting any aid, and the religious institution is not. If somebody goes, a church buys a plot of land at a market rate from me, I'm not giving him aid. I'm engaging in a market transaction, which is sort of the point of the Christian Science Monitor case. Woodland Hills also, Your Honor, I think speaks to this point. Sorry, what? Woodland Hills also speaks to this point as well. And Woodland Hills, okay. So it has to matter in some way that the exchange is not a handslant market rate exchange, and the question is exactly how. And why isn't this one? And so I think what Judge Klontz wants to know is if there's a requirement that you invest $1.7 million and the $1.7 million improvements are going to belong to the city in the end, why isn't that good enough? Well, Your Honor, for several reasons. First is that the city, the Boy Scouts are the predominant users of the land. They have control over who uses it and when, and they are in a superior position as to the public with respect to use. Moreover, when the city was giving the lease to the Boy Scouts, there was a determination made that the period of time necessary to amortize the $1.7 million investment in capital improvements was 10 years. They got a 40-year lease. So by the city's own calculations, that period of amortization doesn't justify the 40-year leasehold that they're receiving. They're in more value. In addition, I would point out – But isn't it true also in general that if I rent land from somebody, and I guess maybe the answer is they didn't choose to build it, they had to build it. But if I build something on there, as a matter of ordinary real estate law, if it's in a pertinence, it does belong to the owner, but that's never really seen as a benefit to the owner. It's simply the way real estate law works. You can't go knocking down the house at the end. Moreover, at the end of the 40-year period, Your Honor, I would submit that the value of these improvements may be de minimis and may cost more money for the city to tear down at the end of the leasehold as well. So I don't believe that there is, just because $1.7 million has been spent in the last seven years, necessarily value to the city that's being achieved as well. There was also a direct payment to the Boy Scouts as well, the $50,000 community development block grant from the city, which the city has acknowledged in parts of its stipulation of material facts, giving to the Scouts. And I can give the record site for that as well, and that is at ER 2728 lines 25 through 27, where the city acknowledged making a payment of over $50,000 to the Scouts to use for improvements of the Scout buildings at the headquarters. And that was a stipulation the city. Kagan. So what about the California Statewide Communities case, which was decided since we last heard the merits in this case, and which does seem pretty pertinent? Yes, Your Honor. I would argue, first of all, first I want to get to the point of creed as well, Your Honor, creed versus sectarian purpose, because I think the distinction one was making before, or my colleague was making before, was about the fact that sectarian purpose is the same thing as Catholic church or Mormon church. In fact, the words in the actual amendment itself are, quote, no grant, I'm sorry, no city or other municipal corporation shall ever make an appropriation or pay from any public fund whatever or grant anything to or in aid any religious sect, church, creed, or sectarian purpose. And as a matter of constitutional construction, the religious sect, which would be thought of as a church, should be interpreted differently as a creed or sectarian purpose. But it's also true that the recent California cases have all talked, seem to me, including Statewide Communities, religion versus nonreligion and not individual sects. But I asked you a particular question. Yes. And it seems to me to be the hardest issue in the case that I'd like to know about. Yes, Your Honor. And I think the application of community statewide here to these facts counsels in favor of finding a no-aid violation. Whether or not the leases confer more than incidental benefit under the California statewide decision, as well as this Court's guidance from Paulson, asks whether or not the aid was available, the benefit was available to secular and sectarian on an equal basis. Here, clearly it wasn't. There are other factors as well. There are no prohibitions directly in the lease for use of the property or the benefit for religious purposes. In fact, the record actually shows the city went out of its way to prefer religion by not including in the Boy Scouts lease the specific prohibition found in the JCCC lease, the Jewish Community Center, to the YMCA, Section 1.12 in those leases that says ---- But presumably not to the Korean Church or other actual churches that seem to rent land from the city as well. Your Honor, in the record, the Korean Church and the, I believe, Point Loma Community Church, those are merely right-of-ways to use a driveway, a city driveway, to either turn around or access the church property or to use for overflow parking on special holidays such as Christmas or Easter. Those are not akin to this lease where we have 15.6 acres being given. But again, the nature of the benefit and how it was made available is critical to not only the no-aid provision but also the no-preference provision of the California Constitution. In granting this lease to the Boy Scouts, the city chose to ignore its own city council policy, 700-4. The mayor and the council gave guidance to the city real estate assets office to not abide by that policy, which would have precluded, as a lessee, an organization that discriminates in membership on the basis of religious nonbelief. The city ignored that policy and exclusively ‑‑ That's a different issue, right? Your Honor, it's related because one of the factors ‑‑ I'm just trying to clarify that you're talking about two different policies. Correct. One of them has to do with religious uses on the property, and the other has to do with the membership of the organizations leasing the property. Correct, Your Honor. There are several preferences that were given. First of all, the fact of the matter is that because of their membership policies, which is city council policy 700-4, the Boy Scouts exclude people on the basis of religious nonbelief and, therefore, should not have been considered for tenancy in Balboa Park to begin with. The city ignored that. Moreover, there is no prohibition in the lease itself, like there are in similar leases, that prohibit the Boy Scouts from either proselytizing on the land or permitting religious activity. Do you have any idea why? I believe it's not there. Your Honor, one of the ‑‑ I think ‑‑ I don't know why. We ‑‑ I think it's evidence of a preference because the fact of the matter is it's in the Jewish Community Center lease, it's in the YMCA, and perhaps most in ‑‑ I seem to be not wanting to answer the question I asked you, which was with regard not to the preference clause but the aid clause, how does the way in which the California State Communities Development Authority case approached the incidental benefit issue apply here? Your Honor, there are three reasons. One of them has to do with the way in which ‑‑ and you're right. There is a separate no preference issue that is addressed by this as well. But one factor that California Statewide used was whether or not the aid was given out in terms of measuring whether it was incidental or not, was whether or not the aid was given out as part of a neutral and open process, whether or not it was available to all. Secondly, under California Statewide, the program needed to have a specific prohibition as part of the program that the funds would not be used for the religious purposes. Here, in granting a lease, the city chose not to include a policy that is present in YMCA lease, in the Jewish Community Center leases, that would have banned and should have banned religious activities on the property. So, again, that fails under California State ‑‑ Excuse me, Your Honor. I'm not sure that it does. I'm not sure it does. When you ‑‑ when the government gives aid to an organization that is by its own Christian or Jewish, as in those two cases, Young Men's Christian Association or Jewish Community Center, there's obviously a religious element to the organization. So this California Statewide case lets the government avoid the no aid clause by putting in that kind of prohibition. You can use this only for secular purposes. But with the Boy Scouts, their religious content, if any, is very different because they are not an avowedly religious organization. They don't use a religious name or symbol. Religion is not a required part of their program. So it appears that what's incidental there is not only the aid, but also the religion. Your Honor, two points, if I may. I'm over time, but may I answer? You have six minutes more because your other side is here. Okay. Your Honor, first I would note that in the record it is crystal clear that the Jewish Community Center and the YMCA do not exclude people on the basis of religious nonbelief. And at the record you can find the ‑‑ That's not terribly relevant to the use of the land. Well, Your Honor, it is because in addition to that, there is also a prohibition in that lease that forbids religious activities from occurring on the land. Okay. So let's keep a focus on one thing at a time, please. Well, in response to Judge Kleinfeld's question, the very fact of the matter is the JCC, the Jewish Community Center, does not require religious belief or being a member of the Jewish faith to be a member or to receive services. Whereas the Boy Scouts do. The Boy Scouts require an individual to profess a faith and a belief in God and to promise to do his duty to God and to promise to fulfill religious obligations. That is not true of the JCC. It's any God. It's not Christian or Jewish. It could be Wicca. Well, Your Honor, again, I would point the Court to the ‑‑ You mean your God could be Satan, as far as I can tell, and you could take the oath. Your Honor, I would point to the fact that in the Court's, the Ninth Circuit's decision, in a way, in the Second Circuit's decision, in Stefano, Alcoholics Anonymous, which merely requires acknowledgment of a higher power, was deemed to be religious for purposes of the Establishment Clause. And the Boy Scouts themselves have admitted to being, quote, a religious organization. They've admitted that. In the context ‑‑ But in California statewide communities ‑‑ Yes, Your Honor. Clearly, there was aid being given to religious organizations. Yes. No doubt about it. So the question is, why was that not a violation of the No Aid Clause, and why would this one be? Again, Your Honor, here, focusing on the specific organization, the Boy Scouts, the Boy Scouts' aid at this property is not incidental or indirect or remote to their religious purpose. And they have acknowledged, the Boy Scouts have acknowledged that, and this is agreed to and stipulated by them at ER 2009, paragraph 196, they have said that scouting's outdoor program further reinforces the religious nature of the scouting program. The direct quote is, scout outings and other activities ‑‑ But that's also true in the California ‑‑ I mean, in California statewide communities, my understanding is that these schools were pervasively secular schools, meaning, as I understand it, that when they teach history, they teach it from a religious point of view. And what the court seemed to say was, that doesn't matter, as long as they're teaching history, even if they're teaching it from a religious point of view. First of all, am I right about that? That's correct. They assume that the ‑‑ All right. So they're doing recreation from a religious point of view. What's the difference? The very fact of the matter is that they exclude individuals on the basis of religious nonbelief. But I mean, I'm willing to assume, I don't know for sure, that there's no limitation in the California statewide communities case to schools that do or don't restrict admission based on religion. Is there? No, I don't believe there is, Your Honor, my recollection of the case. But here, again, the nature of the way in which the aid is used by the scouts, it is the headquarters for their entire San Diego and Imperial County scout program from which they run this program that has as its first value the inculcation of religious ‑‑ or of a certain set of beliefs and principles in youth, which That's where they run their program from, from city property. So the aid is not incidental to that purpose. It's direct. They use it to further their scouting program, which they acknowledge in the record. In the California ‑‑ I mean, I find the California statewide communities case a troublesome case, but we have it. And having it, it seems to say, is there any rule there that you can't use it to build an administration building for a pervasively sectarian college? As I understood it, you couldn't use it to build a chapel, but you could use it to build an administration building. I believe that may be correct from the logical progression of the Court's opinion in that case. But moreover, the test that was set forth, the four‑prong test set forth in California statewide is not met here by the aid to the Boy Scouts. Again ‑‑ All right. Now we're finally getting to the issue. So please tell me why. There was a four‑step test that was enunciated, and the Boy Scouts admit this in their brief as well, in their opening supplemental brief. The four‑part test was, one, the program must serve the public interest and provide no more than an incidental benefit to religion. Two, the program must be made available to both secular and sectarian institutions on an equal basis. This lease, this benefit, this program, the lease to Balboa Park and the lease to Mission Bay was not made available to both sectarian and nonsectarian. Can you expand the number of leases under scrutiny and say we have to look at the whole program of San Diego rather than just this lease? I don't believe so, Your Honor. I think, again, here the relevant inquiry under both no aid and also the no preference clause is this benefit, this benefit that was given to the organization. And this Court in Ellis, Ellis v. City of La Mesa, declined a party's effort to try to get the Court to look beyond just the benefit being conferred. Well, you know, I think of Van Orden or something where the Supreme Court says, well, the Ten Commandments certainly are a religious thing. But when it's just one of 21 monuments scattered around the courtyard, it really it doesn't seem to be an endorsement or, you know, it won't be interpreted as a state preference of religion for purposes of the establishment clause. And if I understand one of the arguments made by your opponent is that San Diego leases to all kinds of different people and negotiates some of them exclusively, you know, it puts some out for with a proposed bid. But any well-educated person, meaning educated in terms of what's been going on, would look at all these things and say, well, you know, they're really not. They're really not endorsing religion here. It's just happened to be a religious organization. It's one of the people who's operating some city services. Two points of response, Your Honor. First, I know Your Honor's question was focused on the establishment clause in the McCrory case. But first, under the State constitution, the no preference clause, that's been held under the Sands case from the Supreme Court in 1991 to test whether or not the benefit was made available to religion and to society at large or non-religion on an equal basis. That was not present here. And moreover, in the context of what a reasonable observer may assume under the establishment clause, I think it actually makes the point. A reasonable observer would know that there had been an outcry of opposition before the lease was approved at the December 4, 2001, city council meeting, that the city did not include in that lease a prohibition of religious activities on the land as it does in other leases, and that the city disregarded its own policy. The city, the council and the mayor gave guidance to the real estate assets office to not apply the policy that should have precluded the scouts from even getting in the door as a potential lessee. A reasonable observer would know all these things and see it as a preference for the religious organization, an organization that excludes nonbelievers and agnostics and atheists. You're way over your time.  Even your extended time. So thank you very much. Thank you, Your Honor. Mr. Kruger. To go straight to the question that you raised, Judge Barzon, about the incidental benefit to religion under California statewide, the California Supreme Court articulated the test that whether there is more than an incidental benefit to religion because the bond initiative there and the leases here do not have a substantial effect of supporting religious activity. In California statewide, that's at 40 Cal 4th at 802, following priest at 12 Cal 3rd at 606. The test in California statewide was whether the bond program or whether the schools were providing broad training in secular subjects and whether that training was neutral with respect to religion. If you map that onto Boy Scouts here, there's no question that from these properties Well, what about the second piece? I mean, the second piece, whether it's neutral in respect of religion, I mean, seems a little bit head in the sand because I assume that these schools, at least some of them, do teach from a religious point of view, but they seem to be assuming otherwise. They seem to be assuming that the secular purpose was being filled without a religious bent, so to speak. The court said that if there were professors, say, who were teaching calculus or history with some sort of religious bent, that that would be no more than an perfectly acceptable if they were teaching calculus or history from the same textbooks as everyone else, but doing it for the greater glory of God. That doesn't violate the no-aid clause. The judge can be right that you have to look at the level of analysis of all the recipients of a bond program and not a particular one. Well, that was a statement of the contending positions, not necessarily a statement of my own. That was an exploration of the argument. So I may be right or I may be wrong, but you don't know what my position is. What it really amounts to is in the Bond case and in Woodland Hills and in the Christian Science Reading Room case, we knew that there was some sort of a regular ascertainable process. Here, even if we look at the large group, there isn't a regular ascertainable process, which makes it hard to say that there isn't some tailoring going. We know there is some tailoring going on. I mean, they wanted the boy scouts because they wanted the boy scouts, not necessarily because the boy scouts were religious, but because they were the boy scouts. And so the question is, how much does that matter? There isn't a neutral system here. There may be neutral, at least not ascertainably religious outcomes, but there is no neutral system. It would seem unworkable, Your Honor, to have a neutral system that said under the no-aid clause, every agreement let by a government entity in the State of California has to go through an RFP. Otherwise, it is not being held open equally to the religious, the areligious and the irreligious, as the district court put it. That would be an unworkable system and would nullify. Why would it be? I mean, I don't know how often cities rent to religious organizations, but I would assume before they – I mean, I would actually assume that before they could rent land to the Catholic Church, it would have to be a market rate transaction with an ordinary open bidding process. And if there were, I would assume it would not be an aid. But one couldn't know in advance whether religious organizations were going to bid or not. And the no-preference clause also prohibits equally discrimination on the basis of religion. Yes, but that's not what happened here. They didn't wait for anybody to bid. They dealt directly with the boy scouts. If the Catholic Church came and said, I want to rent this property at zero rent and I'll build a very nice church on that property, you think that would be fine? Not if it's building a nice church on the property, Your Honor. That's clearly already prohibited under the law. We're talking about a campground here. And religious organizations do get leases to provide – I'll build a very nice building, which we'll use for a church. But when we're all done, it's a very nice building. You can have it. Right. And the whole notion, too, that the value amortizes and disappears over time would come as news to the people that live in this neighborhood, whose homes,  than this building is worth zero. I slightly changed my hypothetical, and I want to know whether that would be fine. If the Catholic Church shows up and says, I want to – or somebody goes to the Catholic Church and says, you know, we like the Catholic Church and we think it would be great if you got this piece of property. We'll rent it to you for zero rent, and you can build something. As long as it doesn't look so much like a church that we can't use it when you're done. Go ahead. If they are providing a public – under California statewide, if they are providing a public benefit and not substantially supporting religious activities, that would be permissible under the no-aid clause. Counsel, I don't understand why we're focusing on what it will be worth after the Boy Scouts go away. I thought most of the public benefit here was having the Boy Scouts maintain this campground while they're there so that the whole general public can use it. Absolutely, Your Honor. Have I got that wrong? This is open to everybody while they're there and they do the work? Which is one of the reasons why the city explained it provides leases like these for a dollar a year for 25 years, because it recognizes that, one, it's almost impossible to determine what the market rate would be, and if they were to approximate some market rate and charge it to the lessee, Boy Scouts would have to pass that cost along to the kids that want to go camping. Let me ask you something else about the program. I'm trying to understand the possibility here of using RFPs. When I used to rent space for my law office, when I first rented, anybody could come to the landlord and offer him the money, and if the landlord thought he was going to be a decent tenant, could get the space. But once I was in there, the landlord would always come to me first, and I always got a little bit of a deal because it was worth it to the landlord to have me think I was long-term and take care of the place and not to have turnover of tenants. Is there, and I think most commercial landlords operate just the same way, is there any provision with the city as a landlord so that it generally has to put renewals up to everybody instead of offering the first shot to the tenant that's there? No, Your Honor, and that's the way the city described its process, that it will often deal with the person that is leasing the property if they're providing benefits. But this was a little odd and irregular because it was done seven years in advance. Right, exactly, because the Boy Scouts needed to know whether they're going to be in the property after that seven-year period to know whether it should be raising money to invest in this property, which it did because it got the lease, or whether it would be turning its charitable resources to other pursuits. You're way over your time as well, and thank both of you for a very helpful argument and a very interesting and difficult case. Thank you. We are in recess. Thank you very much. All rise. This is adjourned.
judges: Canby, Kleinfeld, Berzon, Cjj